# In the United States Court of Federal Claims

No. 20-66C
Filed: May 13, 2020
NOT FOR PUBLICATION

|  |  |
|---|---|
| **LARRY LANDGRAF,**<br><br>　　　　　　　*Plaintiff*,<br><br>v.<br><br>**UNITED STATES,**<br><br>　　　　　　　*Defendant*. | Keywords: Motion to Dismiss; Contract; Duty; Breach; Expectancy Damages; Causation |

*Larry Landgraf*, pro se.

*Rafique O. Anderson*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for the defendant.

**MEMORANDUM OPINION AND ORDER**

***HERTLING*, Judge**

　　The plaintiff, Larry Landgraf, a landowner on Texas's Gulf Coast, sues the United States, acting through the Natural Resources Conservation Service ("the Service" or "NRCS"). The Service moves to dismiss for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted. The Court denies the Service's motion to dismiss, because the complaint is not frivolous, does not sound in tort, seeks monetary damages, and states a claim by alleging conduct from which the Court could reasonably infer a breach of the terms of the alleged contract.

**I.　BACKGROUND**

　　Through the former federal Wetlands Reserve Program, the Service purchased conservation easements from private landowners and shared the cost of restoring the easement properties for use as wildlife habitat and for recreation.[1] Mr. Landgraf alleges that, in 2013, two

---

[1] The Wetlands Reserve Program ran from 1985 to 2014. Food Security Act of 1985, Pub. L. No. 99-198, Title XII, § 1237, 99 Stat. 1354 (1985), *repealed by* Agricultural Act of 2014, Pub. L. No. 113–79, § 2703(a), 128 Stat. 767 (2014). "The easements generally allow federal officers and their contractors to enter the land and perform restoration work, and when the program was

of his neighbors and he conveyed conservation easements to the Service. A representative of the Service, Mr. Landgraf alleges, signed a restoration plan specifying that the Service would "remove" noxious brush from the easement properties.

In May 2017, the plaintiff alleges, the Service directed a contractor to uproot noxious brush on the properties and leave it in place. In the succeeding months the contractor complied. In August 2017, Hurricane Harvey's storm-surge washed uprooted brush from a neighbor's easement property onto Mr. Landgraf's "private" property. Mr. Landgraf alleges that this uprooted brush from his neighbor's property rendered two-thirds of Mr. Landgraf's property impassable and useless pending removal of the brush.

Mr. Landgraf first sued in federal district court for negligence, which that court construed as a suit under the Federal Tort Claims Act, 28 U.S.C. § 1346.[2] Following dismissal of his tort claims, Mr. Landgraf sued the United States in this Court for breach of contract. Mr. Landgraf alleges that a signed agreement into which he entered with the Service contains a promise to "remove" noxious brush from the easement properties. Mr. Landgraf further alleges that, by instructing its contractor to leave the brush on the easement properties after uprooting it, the Service breached its contract with Mr. Landgraf to remove the uprooted brush from the properties. Had the Service not breached that commitment, Mr. Landgraf alleges, he would not have had his property damaged by brush from his neighbor's property during the flooding. Mr. Landgraf seeks removal of the brush from his property and dissolution of the Service's easement to prevent "future violations." He values this relief at $250,000. He also seeks attorneys' fees

---

repealed in 2014 the Conservation Service had easements on roughly 2.3 million acres of land." *Telzrow v. United States*, 127 Fed. Cl. 115, 117–18 (2016) (citations omitted).

[2] The U.S. District Court for the Southern District of Texas dismissed Mr. Landgraf's tort claim for lack of subject matter jurisdiction on two grounds. *Landgraf v. National* [sic] *Res. Conservation Serv.*, No. 18-CV-61, Memorandum and Order, April 9, 2019 (S.D. Tex.) ("*Landgraf I*"). First, that court held that the Service was not a juridical person and that Mr. Landgraf's suit must name the United States as the defendant. *Id.* at 2-3. Second, the court concluded that the Federal Tort Claims Act's waiver of sovereign immunity would not have applied to Mr. Landgraf's suit had it been against the United States, because "the negligence asserted against the United States arises from conduct of a third party aided by an 'act of God'." *Id.* at 3-4. When Mr. Landgraf then filed suit against the United States in the Southern District of Texas, the court dismissed his claim for three reasons: (1) his failure to appeal the first dismissal made the second suit improper; (2) the suit had already been dismissed as against the United States because the Service and the United States were the same entity; and (3) the alleged damage "was caused by a third party and/or 'acts of God'." *Landgraf v. United States*, No. 19-CV-34, Memorandum and Order, Aug. 8, 2019 (S.D. Tex.) ("*Landgraf II*"). The district court denied Mr. Landgraf's motion to transfer his case to this court on the grounds that the case had already been "closed." *Landgraf II*, Order, Aug. 19, 2019 (S.D. Tex.).

and "any other amounts [for] which the United States of America may prove to be liable." (Compl. at V. 2-3.)

The United States has moved to dismiss the complaint for lack of subject-matter jurisdiction and failure to a state a claim under Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC").³ The motion has been fully briefed.

## II. ALLEGED CONTRACT

Mr. Landgraf attached a document labeled "Contract A" to his response to the Service's motion to dismiss. The Court considers this document's provisions as part of Mr. Landgraf's factual allegations. When considering whether a complaint states a claim pursuant to RCFC 12(b)(6), RCFC 12(d) prohibits the Court's consideration of facts outside of the complaint. As an exception to this limit, the Court may consider documents that are "integral" to the plaintiff's claim, such as the contract relied on in a claim for breach of contract. *See Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) ("We may also look to 'matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record.'") (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)).

Like the "Contract A" alleged in the complaint, the document attached to Mr. Landgraf's response brief is signed by Mr. Landgraf and a representative of the Service, outlines the Service's restoration plan, and addresses the removal of brush from the contract property. Finding that the attachment matches the description of the contract alleged in the complaint, the Court considers the attachment as the alleged contract between Mr. Landgraf and the Service and its provisions as part of Mr. Landgraf's factual allegations.

The three-page document is titled "Preliminary [Wetlands Reserve Program] Restoration Plan." (Pl.'s Appx. 1 at 1.) The name of a district conservationist for the Service and Mr. Landgraf's name appear printed at the top of the first page and in signed and dated signature blocks on the final page. Mr. Landgraf's signature line is labeled "Certification of Participants." Both signatures are dated April 23, 2013. (*Id.*)

A box below the title labeled "Objective" provides that "[r]estoration practices will be implemented with intent of restoring vertical heterogeneity to a native monoculture stand of gulf cordgrass, using prescribed fire and brush mgmt., resulting in increased diversity of habitat for the species of concern; Whooping Crane. (Grus Americana)." (*Id.*)

The body of the document starts with the heading "Wildlife." Indented below this heading is a page-width box containing the bold, centered text "Tract: 564." Below that box, and also indented from the "Wildlife" heading, appear seven sections, each titled with an activity or work (*e.g.*, "Brush Management," "Fence"). Each section contains a description followed by a

---

³ For the *pro se* plaintiff's benefit, the Court notes that the Rules of the Court of Federal Claims, not the Federal Rules of Civil Procedure, govern practice and procedure in this Court.

table showing a "Planned Amount" in acres or feet for field "1" along with a year and a month (all specify September). Each table also contains blank spaces for an "Applied Amount" and a date.

The "Brush Management" section provides, in relevant part:

> Remove undesirable brush (Huisache, Mesquite, Chinese Tallow, or China Berry) by hydraulic shears or saw. Remove all Huisache, Chinese Tallow and China Berry. As well as all single stem Mesquite that is 8 inches in diameter or less and all Multi-stem Mesquite. When using hydraulic shears or saw you will have to spray the stump with a mixture of Remedy and Diesel.

It provides a "Cost Rate" of $124.74 per acre and the table indicates 83.08 acres planned for 2014. (*Id.*)

The "Fence" section provides:

> Construct a 4[-]strand barbed wire fence according to NRCS specifications at location shown on plan map. Standards and specifications will be provided to the producer before construction by an NRCS technician.

It provides a cost rate of $1.76 per foot, and the table indicates 7,150 feet planned for 2015. (*Id.*)

The "Firebreak" section provides:

> Establish a strip of bare land 15-20 feet wide for control of prescribed burn area and to be used as a safe area to light the fire. See Burn Map for location of fireguards.

It provides a cost rate of $0.86 per foot, and the table indicates 12,460 feet planned for 2016. (*Id.*)

The "Prescribed Burning" section provides:

> Controlled burns will be conducted as needed to maintain vigor of grass cover, suppress the growth of undesirable species, remove any dead or decaying woody plants and/or remove excessive thatch buildup. Burns will be conducted according to an NRCS approved prescribed burning management plan. Contact the NRCS office for assistance and a prescribed burn plan. [The Texas Commission on Environmental Quality] will have to approve the Burn Plan as well since Smooth Gulf Cordgrass is in the burn unit.

It provides a cost rate of $10.50 per acre, and the table indicates 163.16 acres planned for 2016. (*Id.* at 2)

The "Upland Wildlife habitat Management" section provides:

> The removal of invasive brush species, Huisache, Mesquite, China Berry and Chinese Tallow, as stated in the Brush Management write up, in the upland areas will make for a more open and diverse habitat for the many upland and ground nesting birds, like the bobwhite quail and mottled duck. It will also be of great benefit to the many migratory neo tropical birds and the endangered Whooping Crane. The management of this diverse habitat will also serve as an excellent buffer for the wetlands that lie below the upland.

It provides no cost rate but indicates 83.08 acres planned for 2017. (*Id.*)

The "Wetland Restoration" section provides:

> The restoration of the wetlands on this property will be accomplished by removing the domestic livestock, prescribed burns to control noxious weeds and brush management on species like Mesquite, Huisache, Chinese Tallow and China Berry to encourage vegetative species native to the wetland site to reestablish by natural regeneration.

It provides no cost rate but indicates 163.16 acres planned for 2014. (*Id.*)

The "Wetland Wildlife Habitat Management" section provides:

> The key to wetland wildlife habitat management will be through hydrology and vegetation. Once infrastructure to restore hydrology is implemented, removal of domestic livestock, brush and noxious weed control, efforts are to be made to provide a wetland habitat, conducive for the endangered Whooping Crane, shore birds and other water loving birds, in a manner consistent with natural process. Once the hydrology and vegetation have recovered management, of this valuable ecosystem, can be carried out with prescribed burning as deemed necessary by NRCS personnel.

It provides no cost rate but indicates 80.08 acres planned for 2017. (*Id.*)

## III.  DISCUSSION

### A.  Jurisdiction

The Service moves to dismiss the complaint for lack of subject-matter jurisdiction, arguing that Mr. Landgraf's allegation of a contract is frivolous, his claim sounds in tort, and he only seeks nonmonetary relief, which this Court lacks the power to grant.

Mr. Landgraf is proceeding *pro se*, so his pleadings are entitled to a more liberal construction than the Court would give to pleadings prepared by a lawyer.  *See Haines v. Kerner*, 404 U.S. 519 (1972).  Giving a *pro se* litigant's pleadings a liberal interpretation and construction does not divest the *pro se* plaintiff of the responsibility of demonstrating that he has satisfied the jurisdictional requirements that limit the types of claims the Court of Federal Claims may entertain.  *See, e.g.*, *Kelly v. Sec'y, U.S. Dep't of Labor*, 812 F.2d 1378, 1380 (Fed. Cir. 1987); *Hale v. United States*, 143 Fed. Cl. 180, 184 (2019).

The Supreme Court has interpreted the Tucker Act, 28 U.S.C. § 1491(a), to waive the United States' sovereign immunity and to vest the Court of Federal Claims with jurisdiction over claims that are founded on an express or implied contract with the United States and do not sound in tort.  *See United States v. Navajo Nation*, 556 U.S. 287, 289-90 (2009).  Failure by a plaintiff to "establish the existence of an alleged contract with the government," however, is a "failure to state a claim, rather than [a] lack of jurisdiction." *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1354 (Fed. Cir. 2011).  Plainly frivolous contract claims may be dismissed for lack of subject-matter jurisdiction, although "the Supreme Court has made clear that such jurisdictional dismissals for frivolousness must be 'confin[ed]' to cases 'that are very plain.'" *Lewis v. United States*, 70 F.3d 597, 603–04 (Fed. Cir. 1995) (quoting *Hart v. B.F. Keith Vaudeville Exch.,* 262 U.S. 271, 274 (1923)).

This court lacks jurisdiction to decide tort claims merely "repackaged" as contract or money-mandating claims.  *See Brown v. United States*, 105 F.3d 621, 623-24 (Fed. Cir. 1997) (rejecting, *inter alia*, fraud claims because fraud is a tort); *McCauley v. United States*, 38 Fed. Cl. 250, 264-69 (1997) (rejecting a harassed employee's claim that the Equal Employment Opportunity Commission discriminated against her and breached a duty to accommodate her arising either out of an alleged "special relationship," a statute, or language in the agency's right-to-sue letter); *Cottrell v. United States*, 42 Fed. Cl. 144, 154 (1998) (refusing to allow a plaintiff to "repackage jurisdictionally unsound [tort] claims into a more appealing package by wrapping [them] in a [military pay claim] blanket").

        1.    **Contract with the United States**

The complaint's allegation of a contract with the United States is not plainly frivolous.  Mr. Landgraf's complaint alleges a breach of a specific document containing specific promissory language and signed by an authorized agent of the Service in the context of the plaintiff conveying an interest in his real property.  The complaint alleges these details along with a logical explanation of how the Service's instructions to its contractor were facially inconsistent with the earlier contract and how that inconsistency was a factor in causing Mr. Landgraf's property to fill with uprooted brush and become useless and impassable.  These details are more than "bald assertions" of a contract and do not support a jurisdictional dismissal of the complaint as frivolous.  *Cf. Twp. of Saddle Brook v. United States*, 104 Fed. Cl. 101, 110 (2012) (dismissing for lack of subject-matter jurisdiction a complaint that alleged an implied-in-fact contract arising out of "numerous promises" by an agency to fix a flooding problem).

### 2. Not Sounding in Tort

Mr. Landgraf's claim does not necessarily sound in tort. The Service argues that Mr. Landgraf's claim should be rejected as one that squarely sounds in tort, has its essence lying in tort, or is simply a tort claim repackaged as breach of contract. The complaint focuses on the defendant's failure to fulfill a specific promise, namely, to "remove" uprooted brush from the easement properties, arising from a specific written, signed agreement that the plaintiff had with the Service. Although the *pro se* complaint uses some tort-related words like "negligence" and "fiduciary duty," the paragraphs in which these terms appear assume the existence of a contract and are most fairly read as tautological statements that the United States, like private parties, has a duty to fulfill its contractual obligations.

To be sure, Mr. Landgraf's claim raises difficult issues of foreseeability and causation not unlike those considered in tort claims. Mr. Landgraf seeks expectancy damages, which "make a non-breaching party whole by providing the benefits expected to be received had the breach not occurred." *Third Bank v. United States*, 518 F.3d 1368, 1374 (Fed. Cir. 2008). Recovery of expectancy damages against the United States requires foreseeability at the time of the contract, causation, and reasonable certainty as to the measure of damages. *Id.* As long as the evaluation of Mr. Landgraf's alleged damages is limited by the scope of the promises the Service made to Mr. Landgraf in the alleged contract, these issues may be considered as issues of contract-law expectancy damages without resort to generally applicable tort-law duties as a basis for the Service's liability. *See SGS-92-X003 v. United States*, 85 Fed. Cl. 678, 711 (2009) (holding that the United States breached a contractual duty to a confidential informant *but requiring* the confidential informant to prove that her kidnapping and ensuing damages resulted from the breach); *see also Telzrow v. United States*, 127 Fed. Cl. 115, 124-25, (2016) (construing a *pro se* complaint arising out of the Wetlands Reserve Program as a complaint for breach of the parties' cost-sharing agreement).

### 3. Money Damages

The Court construes Mr. Landgraf's prayer as a request for money damages. Along with its prayer for specific performance and dissolution of the Service's easement, relief this Court is not authorized to provide, the complaint expressed the relief sought by the plaintiff as a sum certain dollar amount and asked for "any other *amounts* [for] which the United States of America may prove to be liable." (Compl. at V. 2-3 (emphasis added).) It is true that this Court lacks jurisdiction to award equitable relief such as that sought by the complaint, and the Court will disregard those claims. It is unlikely, however, that Mr. Landgraf would have included a total dollar amount and a reference to "any other amounts" if he were not seeking money damages as an alternative to the equitable remedies the complaint requests. The Court finds the complaint susceptible to a construction that the plaintiff is seeking monetary damages for the alleged breach of contract.

### B. Failure to State a Claim

The Service alternatively argues that Mr. Landgraf's claim must be dismissed under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. The Service argues

that it cannot be held liable for the damages caused by an act of God like Hurricane Harvey without having explicitly assumed such liability in the contract. Additionally, the Service argues that it could not have breached the alleged contract with Mr. Landgraf because nothing in the contract as alleged by Mr. Landgraf would have created a duty to remove from Mr. Landgraf's property brush that originated on a neighbor's property. The Service's argument does not directly address what the Court understands to be Mr. Landgraf's theory of recovery, which is that the Service, as part of the removal process, had a contractual duty to burn or otherwise dispose of the uprooted brush on the neighbor's property before the brush could be deposited on Mr. Landgraf's property.

The Court finds that Mr. Landgraf's complaint states a narrow claim for removal of the brush from his property but does not state a claim for damage caused by the brush originating from his neighbor's property. The Court declines to address the Service's act-of-God defense at the motion-to-dismiss stage.

For a claim to avoid dismissal, it must be "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To test a claim's plausibility, the Court sets aside the complaint's legal conclusions and focuses on the facts the complaint alleges, accepting them as true. *See id*; *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1380 (Fed. Cir. 2019). If these facts, when accepted as true, allow the court reasonably to infer "that the defendant is liable for the misconduct alleged," the claim is plausible. *Iqbal*, 556 U.S. at 678. "Plausible" means more than "possible;" plausibility requires more than facts that are "merely consistent with" a defendant's liability. *Id.* Nevertheless, in considering a motion to dismiss under RCFC 12(b)(6), "the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). The Court "must presume that the facts are as alleged in the complaint and make all reasonable inferences in favor of the plaintiff." *Cary v. United States*, 552 F.3d, 1373, 1376 (Fed. Cir. 2009).

To state a claim, Mr. Landgraf must allege conduct by the Service that the Court can reasonably infer breached the Service's contractual duties to Mr. Landgraf. The signed WRP Restoration Plan document is the contract the complaint alleges, so the Court may review the Plan document's provisions as part of Mr. Landgraf's allegations. At least one provision explicitly provides for the removal of "any dead or decaying woody plants." Mr. Landgraf may be able to recover the limited cost of removing the brush pursuant to that provision. No provision of the alleged contract creates a duty to Mr. Landgraf to remove brush on a neighbor's land, thus Mr. Landgraf cannot recover damages for breach of his contract with the Service based on the value his property would have had if the Service had fulfilled its contract with his neighbor.

### 1.     Duty to Remove Brush on Mr. Landgraf's Property

Certain provisions of the alleged contract allow the court to infer that the contract creates a duty to remove brush located on Mr. Landgraf's property. The first words of the body of the contract, under the heading "Brush Management," are "[r]emove undesirable brush." The contract's "Upland Wildlife Habitat Management" section refers back to this brush management, noting that it will "make for a more *open* and diverse habitat" (emphasis added) for certain birds.

The description of the brush management work, however, suggests that "brush management" may only contemplate the removal of brush *growing* on Mr. Landgraf's property. The contract specifies "hydraulic shears," "saw," or chemicals as brush management methods. The use of shears and saws for removal assumes brush that is attached to the land. The use of chemicals for removal assumes brush that is alive and thereby susceptible to elimination by herbicides.

The "Prescribed Burning" section of the alleged contract may create a broader duty to remove brush than the "Brush Management" section. It provides for controlled burns "as needed to maintain [the] vigor of grass cover, suppress the growth of undesirable species, remove any dead or decaying woody plants and/or remove excessive thatch buildup." Moreover, the alleged contract planned for almost 163.16 acres of prescribed burning, which is nearly double the 83.08 acres planned for in the brush-management section. By providing for the removal of "any dead or decaying woody plants," this provision of the alleged contract may create a duty to remove the described brush on Mr. Landgraf's property, whether or not the brush originated on that property, including brush that flooding deposited there, such as the brush that first grew on a neighbor's property and was uprooted by the Service.

If Mr. Landgraf can establish that the alleged contract's "Prescribed Burning" provision creates a contractual duty to remove brush from his property that did not originally grow on his property, he may be able to recover the limited cost of removing this brush.

### 2.     No Duty to Remove Brush on Neighbor's Property

No provision of the alleged contract creates a duty to Mr. Landgraf to remove brush on a neighbor's property. Various features of the alleged contract indicate that its alleged commitments refer only to a single property and not to Mr. Landgraf and his neighbors' properties collectively. The contract's heading refers to a single tract number. The descriptions of work in the contract consistently refer to the—singular—"property." The tables indicating planned amounts of work refer only to a single area, labeled field "1."[4] Indeed, the header on the first page and the signature blocks on the last page contain Mr. Landgraf's name, address, and signature but do not contain the names, addresses, or signatures of neighboring landowners. Accordingly, the court cannot reasonably infer that the terms of the alleged contract refer to—or create a duty to remove brush from—any property other than Mr. Landgraf's.

The alleged contract's specificity to Mr. Landgraf's property means that the possibility that the Service could have prevented any damage to Mr. Landgraf's property by removing the brush from a neighbor's property soon after it was uprooted cannot be the basis for the Service's contractual liability to Mr. Landgraf. The Service's liability to Mr. Landgraf for breach of contract is limited by its contractual duties to Mr. Landgraf, including the duty to remove brush

---

[4] Mr. Landgraf did not allege the total acreage of his property, leaving the Court unable to determine whether the acreage of planned work indicated in the alleged contract's tables exceeds the total area of Mr. Landgraf's property and thus potentially refers to neighboring properties.

on his property, irrespective of its origin.  On the other hand, the Service's contract with Mr. Landgraf created no duty to remove brush from the neighbor's property such that the plaintiff can collect consequential damages for the Service's failure to remove such brush before it ended up on Mr. Landgraf's property.

In sum, the Service could not have breached a duty to Mr. Landgraf that it did not have, even if it breached a nearly identical duty it had to Mr. Landgraf's neighbor.  The breach-of-contract claim that the complaint alleges cannot extend to, and Mr. Landgraf therefore cannot recover, damages based on the value his property would have if the Service had fulfilled its contract with a neighbor.

### 3. Act of God Defense

The Service argues that an affirmative defense clearly implicated by the complaint may be raised in a motion to dismiss.  The complaint alleges that Hurricane Harvey's storm surge was a factor in moving the uprooted brush from a neighboring property onto Mr. Landgraf's property.  In another case, this court has limited the United States' liability for flooding caused by Hurricane Harvey, deeming flooding caused by the storm an act of God.  *See In re Downstream Addicks and Barker (Texas) Flood Control Reservoirs*, No. 17-9002, 2020 WL 808686, at *9 (Fed. Cl. Feb. 18, 2020).  In this case, however, facts pleaded in and arguments cited by the district court in the plaintiff's tort case, of which this Court takes judicial notice, suggest that the flooding at issue was neither exceptionally severe nor unforeseeable.  Mr. Landgraf's district court complaint alleged that over 54 years two floods more severe than the one caused by Hurricane Harvey had caused only minimal damage to his property.  Mr. Landgraf also alleges that flooding was foreseeable, suggesting that the Service should have accounted for hurricane season when deciding not to remove the brush.  Indeed, the Court cannot help but notice that the uprooted brush was left on property the Service formally designates as *wet*lands.  The relative severity and foreseeability of Hurricane Harvey-related flooding that supported an act-of-God defense in another case are not implicated clearly enough in this case to cut off liability as a matter of law without some development of the facts.

\*   \*   \*

For the purpose of deciding the Service's motion to dismiss, the "Prescribed Burning" provision of the alleged contract provides a sufficient basis for the Court reasonably to infer that the Service had a contractual duty to remove brush from Mr. Landgraf's property.  Mr. Landgraf's allegations as to the current impassable state of his property and the Service's abandonment of its removal efforts provide a reasonable basis from which to infer a breach of that duty.  Mr. Landgraf's complaint, when read together with the alleged contract, satisfies the plausibility standard of *Iqbal* and states a claim upon which relief can be granted.  Any relief,

however, will be limited only to the cost of the brush removal, because the removal of the brush is all the alleged contract requires.[5]

## IV.     CONCLUSION

The Court **DENIES** the defendant's motion to dismiss under RCFC 12(b)(1) and 12(b)(6).  The defendant will file its answer to the complaint on or before **May 27, 2020,** as required by RCFC 12(a)(4)(A)(i).  The Court directs the parties to submit on or before **May 27, 2020,** concurrently with the defendant's answer, a jointly proposed schedule for discovery.  Discovery will be limited to the following issues: (1) whether the "Prescribed Burning" provision of the Preliminary WRP Restoration Plan document created a contractual duty for the defendant to remove uprooted brush originating on his neighbor's property from Mr. Landgraf's property; (2) whether the flooding that deposited the brush on the plaintiff's property was foreseeable when the alleged contract was executed; and (3) other affirmative defenses the defendant intends to assert in its answer to the complaint.

It is so **ORDERED**.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**

---

[5] The Court will not prejudge the appropriate amount of damages.  Nevertheless, to offer the parties a sense of proportion, the Court notes that the plaintiff's dismissed tort claim estimated the cost of brush removal to be $5,800 (*see* Mot. Dismiss Appx. at 49).